28 A.3d 797

**Brett Russell MOLTER**

v.

**STATE of Maryland.**

**No. 1079, Sept. Term, 2010.**

Court of Special Appeals of Maryland.

Sept. 7, 2011.

Kellie M. Black (Paul B. DeWolfe, Public Defender, on the brief), Baltimore, MD, for appellant.

Diane E. Keller (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for appellee.

Panel: GRAEFF, WATTS, CHARLES E. MOYLAN, JR. (Retired, Specially Assigned), JJ.

CHARLES E. MOYLAN, JR. (Retired, Specially Assigned), J.

Suppose that Scotland Yard, in late 1888, could have established that an otherwise innocuous denizen of London's Whitechapel neighborhood had been in the unexplained possession of a locket worn no more than two or three days earlier by one of the victims of Jack the Ripper. How far might the Crown have gone with the resulting inference? It is just such an inference, and the reach of its inferential potency, that is the primary focus of this appeal.

### Contentions, Good and Bad

The appellant, Brett Russell Molter, was convicted in the Circuit Court for Harford County by a jury, presided over by Judge Emory A. Plitt, Jr., of first-degree burglary and theft of goods of the value of $500 or more. On appeal, he raises five questions:

1. Was the evidence legally sufficient to support his conviction for first-degree burglary?

2. Did Judge Plitt erroneously rule that he could not impeach a State's witness with evidence of that witness's probation before judgment?

3. Did Judge Plitt erroneously deny his motion for a mistrial?

4. Did the prosecutor's .comments during opening statement and closing argument prejudice his right to a fair trial? and

5. Did Judge Plitt erroneously deny him his right to put on before the jury a simple demonstration?

## Legal Sufficiency of Proof of Burglary

The theft in this case occurred in the course of a burglary. The appellant does not challenge his conviction for theft. His contention is only that the evidence was not legally sufficient to support the conviction for first-degree burglary. The victims of the combined theft/burglary were Eric Eisenrauch and his live-in girlfriend, Amy Batchellor, who lived together in a two-story house in Joppa, Maryland. The burglary (and theft) occurred while Eisenrauch and Ms. Batchellor were spending a weekend in New York. The window of· opportunity for an unimpeded burglary was one of two days and a few hours between when the two left to drive to New York on Saturday, April 18, 2009, and when they returned to their home at approximately 2 P.M. on Monday, April 20, 2009.

When the two arrived home, they observed that the back door óf the house had been broken open. They walked inside and found that the house had been ransacked. Deputy First Class William Middleton responded to the scene at 2:50 P.M. and observed that the side door had been forcibly opened. Inside the house, he noted that the "main evidence of ransacking" was in the bedroom and the closets. The appellant's challenge to the burglary conviction was not with respect to the proof of the *corpus delicti,* but only to the proof of his criminal agency.

## The First Strand in the Web

Eisenrauch testified that, before leaving for New York, he had told two people about his impending trip: 1) his business partner, Keith Geiser; and 2) the appellant. Eisenrauch and the appellant had known each other for 20 years (since they had both been in the 6th grade together) and were, prior to April of 2009, very good friends. Eisenrauch described the appellant as a good handyman who had worked for him on various projects over the years. The knowledge that the homeowners would not be home is far from being proof of guilt, but it is a helpful clue. And a clue need only be a clue.

## Presence At The Crime Scene

In addition to his having knowledge that the house would be unoccupied over that weekend, the appellant was also observed at the scene during the critical window of opportunity by Paul Haye, a long-term acquaintance of both the appellant and Eisenrauch. Haye testified that on Saturday evening, April 18, 2009, he was visiting a friend who lives down the road from the Eisenrauch house. At some time between 5:00 P.M. and 8:00 P.M. that evening, but while the sun was still out, Haye was driving on Joppa Farm Road and turned left onto the street where Eisenrauch lived. He happened to see the appellant, whom he knew, standing in front of the Eisenrauch house but had no idea what he was doing there. Haye further testified that the appellant then walked toward the side door, the door through which the forced entry into the house was made.

In seeking to devalue this testimony placing him at or near the crime scene, the appellant, it would seem, "doth protest too much:"

"The only evidence that the State presented suggesting that Mr. Molter [the appellant] was ever anywhere near Mr. Eisenrauch's house at any point during the weekend in question was *the incredible testimony* of Mr. Haye."

(Emphasis supplied).

The persuasiveness of evidence may depend upon the credibility of the witness, but its legal sufficiency does not. In

assessing the legal sufficiency of the evidence, of course, it is not our prerogative to evaluate the credibility of a witness. That is exclusively the job of the fact-finding jurors. *State v. Smith,* 374 Md. 527, 533–35, 823 A.2d 664 (2003); *Pinkney v. State,* 151 Md.App. 311, 325–29, 827 A.2d 124 (2003).

Inevitably, inquisitive jurors may ask themselves, "Why was the appellant at that particular place at that particular time?" They will then proceed to answer the question for themselves, particularly in the total absence of either denial or explanation by the defense. Inquisitive fact finders might suppose that no explanation was forthcoming because there was no innocent explanation. That, of course, is what circumstantial evidence is all about. A particular circumstance may not be sufficient proof of guilt unto itself, but it may nonetheless be a strand in an emerging web of proof.

### A Dispositive Inference

In terms of proof of the appellant's guilt, the clincher was the inference, from his unexplained possession of recently stolen goods, that he was the thief of those stolen goods. It appears that the first reference by the Court of Appeals to this permitted inference of guilt that fact finders may draw from the unexplained possession of recently stolen goods was in *Debinski v. State,* 194 Md. 355, 360, 71 A.2d 460 (1950):

> The law is clear that recent possession of stolen goods is evidence of guilt of the possessor and casts the burden on the possessor of such stolen goods to give a reasonable explanation of how he came into its possession.
>
> "It has long been a well established rule of evidence in a criminal charge of larceny that recent possession of stolen goods gives rise to a presumption that the possessor is the thief." *United States v. Washington,* 69 F.Supp. 143, 147 (1946), and authorities there cited.

That precedent has been consistently followed for the intervening 61 years. *Felkner v. State,* 218 Md. 300, 305, 146 A.2d 424 (1958); *Butz v. State,* 221 Md. 68, 77–78, 156 A.2d 423 (1959); *Glaros v. State,* 223 Md. 272, 280, 164 A.2d 461 (1960);

*Lewis v. State,* 225 Md. 474, 475–76, 171 A.2d 244 (1961); *Byrd v. State,* 229 Md. 148, 182 A.2d 47 (1962); *Stapf v. State,* 230 Md. 106, 108, 185 A.2d 496 (1962); *Cason v. State,* 230 Md. 356, 358, 187 A.2d 103 (1963); *Brooks v. State,* 235 Md. 23, 200 A.2d 177 (1964); *Curry v. State,* 235 Md. 378, 201 A.2d 792 (1964); *McCray v. State,* 236 Md. 9, 202 A.2d 320 (1964); *Bey v. State,* 237 Md. 627, 206 A.2d 559 (1965); *Anglin v. State,* 244 Md. 652, 224 A.2d 668 (1966).

■ By the time of *Brewer v. Mele,* 267 Md. 437, 298 A.2d 156 (1972), the Court of Appeals had cleaned up the somewhat dated language of *Debinski v. State* in two minor respects. Instead of speaking of "the recent possession of stolen goods" it more carefully spoke of "the possession of recently stolen goods." Instead of a legal presumption that the possessor was the thief, it more carefully referred to "the permitted inference of fact" that the possessor was the thief. It never was a presumption, of course. It was simply the case that our appellate analysis in 1950 was not yet up to making the nuanced distinction. As of *Brewer v. Mele,* however, the language was more precise:

> We have long and consistently held that exclusive possession of recently stolen goods, absent a satisfactory explanation, permits the drawing of *an inference of fact strong enough to sustain a conviction* that the possessor was the thief.

267 Md. at 449, 298 A.2d 156 (emphasis supplied).

The permitted inference is more than a strand; it is proof of guilt that may stand alone. *See also Cross v. State,* 282 Md. 468, 480, 386 A.2d 757 (1978); *Grant v. State,* 318 Md. 672, 680–81, 569 A.2d 1237 (1990); *Smith v. State,* 367 Md. 348, 359, 787 A.2d 152 (2001).

All necessary elements for the permitted inference were in place in this case. Both Eisenrauch and Ms. Batchellor had furnished the police with a lengthy and detailed description of items that had been stolen in the course of the burglary. In a search of the appellant's car on Monday, April 27, 2009, the police recovered from the trunk of the car no less than six of

the items that had been taken in the course of the burglary. Ms. Batchellor identified 1) a Dooney and Bourke purse; 2) a Louis Vuitton purse; 3) a Breitling watch box; 4) a black canvas tool bag; and 5) a silver necklace. Eisenrauch, in addition, identified a Sharp video camera. All of those items had been described to the police in detail when the police first responded to the crime scene.

### How Recent Is "Recently"?

■ "Recently stolen" is a relative term that cannot be pinned down with mathematical precision. In this case it was established that the appellant was in possession on April 27, 2009 of goods that had been stolen between April 18 and April 20, 2009, some seven to nine days earlier. Does that properly qualify as having been "recently stolen?"

It unquestionably does. In the archetypical case of *Debinski v. State,* the lapse of time between the original theft and the subsequent possession was nine days. The Court of Appeals, 194 Md. at 359–60, 71 A.2d 460, held, "[W]e do say that an article in one's possession nine days after it was stolen is a recent possession." In *Butz v. State,* the Court of Appeals, 221 Md. at 77, 156 A.2d 423, dealt with lapses of nine and fourteen days:

> It will be noted that the testimony disclosed that *he was in possession of [stolen articles] approximately fourteen days after the first burglary and about nine days after the second.* The appellant claims this possession is too remote from the date of the burglaries to constitute "recent" possession. . . . In the instant case, we again decline to set up "a period of limitation" . . . but *have no hesitation in holding that the defendant's possession . . . of the articles taken* from the Compion and Konski residences *was "recent" for the purposes of the rule being considered.*

(Emphasis supplied).

In *Cason v. State,* 230 Md. at 358, 187 A.2d 103, the Court of Appeals went significantly further:

*The lapse of something over four months* of time, under the circumstances of this case, *was insufficient to destroy the probative effect that the trier of facts was entitled to give to the "recent" possession of the stolen property by the accused,* in the absence of a reasonable explanation of his possession.

(Emphasis supplied).

In *Anglin v. State,* 1 Md.App. 85, 227 A.2d 364 (1967), *cert. denied,* 246 Md. 755 (1967), Judge Orth wrote for this Court, in affirming two separate burglary convictions, that respective time lapses of one month and six months between the possession and two original larcenies did not vitiate the potency of the inferences:

We feel, under the circumstance of this case, *the possession was "recent"* within the contemplation of the rule.

1 Md.App. at 93, 227 A.2d 364 (emphasis supplied).

If some of these time periods seem inordinately long for the original theft to be deemed "recent," it must be remembered that these were legal holdings and not findings of fact. The caselaw never said that the events were necessarily recent. It simply said that fact finders might reasonably deem them to be so. This is not to say, moreover, that the passage of time between the possession and the original theft may not have a debilitating effect on the inference. Long before the point where the drawing of the inference might be prohibited, as a matter of law, the length of the interval may well have weakened the likelihood that fact finders, in their discretion, will choose to draw the inference, as a matter of fact. Short of some outside limit not yet established by the caselaw, however-er, the effect of attenuation remains in the province of fact-finding rather than in that of legal sufficiency review. It is simply in the nature of the respective standards that an event may cease to be recent, as a matter of fact, long before it necessarily has ceased to be recent, as a matter of law.

In this case, the goods recovered from the trunk of the appellant's car were "recently stolen" within the contemplation

of the rule, and the inference that he was the thief was clearly permissible.

### Defense Failure to Offer an Explanation Is At Its Own Peril

What eight very specific items taken in a burglary were doing in the trunk of the appellant's automobile between seven and nine days later was never explained by the defense. It did make a half-hearted attempt with respect to one of the purses but offered absolutely nothing with respect to any of the other items of stolen property. The only defense witness was the appellant's mother. She testified that she thought that one of the purses in the trunk had earlier been given by Amy Batchellor as a gift to the appellant's girlfriend, Jill Hamilton. She did not testify that she had ever seen the transfer. Jill Hamilton was never called as a witness.

The impact of the defense's failure even to try to explain why the stolen articles were in the appellant's automobile would have been overwhelming. The inference that he was, therefore, the thief is an inference in this case of almost irresistible potency.

■ In *Anglin v. State*, 244 Md. 652, 662–63, 224 A.2d 668 (1966), Chief Judge Hammond explained that the adverse effect of the tactical decision of the defense not to counter the State's evidence by offering some explanation for the possession of recently stolen goods does not impinge on a defendant's Fifth Amendment privilege against compelled self-incrimination. · In a sense, all evidence of guilt puts some tactical pressure on the defense to respond and the jurors are not blind to what responses are and are not forthcoming.

*Anglin's contention that his failure to take the stand was used to or did incriminate him will not stand analysis.* The constitutional prohibition against the use in any way by counsel or the trial court of the failure of the accused to testify is to prevent failure of or a deficiency in the State's case from being supplied or supplemented in any way directly or inferentially by the compelled testimony of the

accused. *Here the State's case offered prima facie evidence of Anglin's having burglarized the Weiss house by showing that soon after the burglary he had exclusive possession of an article stolen from that house, a possession that, if unexplained, permitted an inference of fact that Anglin had broken into the house and stolen the article.* The trial judge showed in his dialogue with Anglin that he appreciated that *Anglin's decision not to testify added nothing to the State's case and could not to any extent prejudice Anglin. The State's case was prima facie complete to the point of justifying the determination of the trier or fact that Anglin was the burglar when Anglin decided not to offer evidence in rebuttal.* The situation essentially is not different than if the State had offered an eyewitness to Anglin's breaking into the Weiss house. If he chose not to rebut the eyewitness' testimony, his decision could not effectively be claimed to have amounted to self-incrimination. In the case before us and in the case just suggested, *the State proved enough to permit a trier or fact to find guilt and the accused chose not to attempt rebuttal. Anglin's claims on the constitutional issue must fail.*

(Emphasis supplied).

### The Long–Distance Striking Power of the Inference

The appellant seeks to sow the wind but avoid reaping the whirlwind. He may not so adroitly cut his losses. He chose not to challenge the legal sufficiency of the evidence to support his conviction for theft. He thereby implicitly acknowledged the inculpatory potency of the inference arising out of his unexplained possession of recently stolen goods. The other two evidences of his guilt were only peripheral. In arguing that there was no evidence connecting him with the burglary, he implicitly relies on an unspoken expectation that the inference of his guilt will stop abruptly at the outer boundary of theft and will not penetrate into related crimes that may be inextricably interwoven with the theft.

The fatal flaw in the appellant's legal insufficiency argument, however, is in the insubstantiality of the wedge he

would like to drive between proof of theft and proof of burglary. He acknowledges the legal sufficiency of the proof of theft.

> Admittedly, *the testimony* of Mr. Eisenrauch and Ms. Batchellor identifying certain items found in Mr. Molter's car as their stolen property *provided a sufficient basis for a theft conviction,* based on a theory that Mr. Molter had received the stolen items. Because the State failed to present any evidence showing that Mr. Molter broke into and entered Mr. Eisenrauch's house, however, his conviction for first degree burglary should be reversed.

(Emphasis supplied).

What the appellant fails to do is to follow the permitted inference out to its ineluctable logical limits. The permitted inference, of course, is that the unexplained possessor of the recently stolen goods was the actual original thief, who picked up the stolen goods and carried them away in the first instance. If the evidence, moreover, establishes that the theft was inextricably part and parcel of a burglary or a robbery (or, for that matter, a murder or a rape or an arson), the indivisibility of the total criminal package establishes the criminal agency of the possessor for whatever role he played in the criminal episode.

Although the imprimatur of approving caselaw is always comforting, the phenomenon that we are talking about is more a function of the inherent logic of the circumstances and, only incidentally, one of law. The time-honored inference that we have been discussing establishes that A (the unexplained possessor of the recently stolen goods) is, in terms of a legally sufficient and permissible deduction, B (the original thief of the goods). If other evidence, showing an interwoven corpus delicti, then establishes that B was to a reasonable certainty also C (a burglar or a robber or a murderer or a rapist or an arsonist), the inference has simply been taken to its logical conclusion. It is not even a double inference. If A is B and B is C, then A is C. It cannot be otherwise.

■ In this case, moreover, we do have the comforting reassurance of the caselaw. The Court of Appeals stated the penetrative impact of the inference unambiguously in *Brewer v. Mele,* 267 Md. at 449, 298 A.2d 156:

[P]ossession of recently stolen goods, absent a satisfactory explanation, permits the drawing of an inference . . . that the possessor was the thief . . . *or, where the theft was compounded, that the possessor was also the burglar . . . or the robber.*

(Emphasis supplied).

Indeed, the permitted inference that the possessor was the thief coupled with evidence that the theft was a compound theft has regularly been held to be legally sufficient to convict the possessor of the compound theft in all of its compounded manifestations. *Debinski v. State,* 194 Md. at 358, 71 A.2d 460 (breaking and entering); *Felkner v. State,* 218 Md. at 305, 146 A.2d 424 (burglary); *Butz v. State,* 221 Md. at 76–77, 156 A.2d 423 (burglary); *Oden v. State,* 223 Md. 244, 246, 164 A.2d 284 (1960) (burglary); *Lewis v. State,* 225 Md. at 475–76, 171 A.2d 244 ("Clearly these established facts were sufficient to support a credible inference that the possessor was the burglar as well as the thief."); *Ponder v. State,* 227 Md. 570, 571–72, 177 A.2d 839 (1962) (burglary); *Boggs v. State,* 228 Md. 168, 172, 179 A.2d 338 (1962) ("Appellant's possession of the stolen property . . . was enough to give rise not only to the inference of fact that he was the thief . . . but would also tend to support an inference that as the possessor he was the burglar as well as the thief."); *Howard v. State,* 238 Md. 623, 624, 209 A.2d 604 (1965) ("When he was arrested, appellant was wearing a pair of shoes which had been recently stolen and he could give no reasonable explanation of how they came into his possession. The trial judge could properly draw from the circumstances the inference of fact that he was the burglar."); *Anglin v. State,* 244 Md. 652, 658, 224 A.2d 668 (1966) (burglary).

The Court of Appeals reaffirmed this consistent line of holdings in *Grant v. State,* 318 Md. 672, 680–81, 569 A.2d 1237 (1990):

> Ordinarily, the unexplained exclusive possession of recently stolen goods permits an inference that the possessor is the thief . . . . and *when it is shown that the property was stolen as a consequence of a breaking, the trier of fact may further infer that the thief was involved in the breaking.*

(Emphasis supplied).

This Court has invariably taken the same approach. In *Anglin v. State,* 1 Md.App. 85, 92–94, 227 A.2d 364 (1967), *cert. denied,* 246 Md. 755 (1967), the inference that the defendant was the thief was enough to convict him of theft as well of the two interlocking crimes of daytime housebreaking and common law burglary. In *Reagan v. State,* 4 Md.App. 590, 605, 244 A.2d 623 (1968), the inference led to a conviction for daytime housebreaking. In *Bever v. State,* 4 Md.App. 436, 444, 243 A.2d 634 (1968), *cert. denied,* 252 Md. 729 (1969), this Court held:

> Possession of recently stolen goods supports *a credible inference that the possessor was the thief, and, coupled with evidence of a breaking, that he was one who performed the breaking.*

(Emphasis supplied). *See also Allen v. State,* 2 Md.App. 740, 745, 237 A.2d 90 (1968) ("As to the burglaries, *possession of goods recently stolen in a burglary is evidence that the possessor was the burglar* and casts the burden on the possessor to give a reasonable explanation of how he came into its possession.") (Emphasis supplied).

In *Wynn v. State,* 69 Md.App. 536, 542, 518 A.2d 1072 (1987), *aff'd in part, rev'd in part on other grounds,* 313 Md. 533, 546 A.2d 465 (1988), Judge Alpert rejected a contention indistinguishable from the one now being made by the appellant in this case.

> Appellant next contends that the evidence was insufficient to sustain his convictions for housebreaking and theft because there was no direct evidence that he broke into the Prausers' home and stole the items found in the bag; the only evidence against him was circumstantial.

As we reiterated in *Samuels v. State*, 54 Md.App. 486, 493, 459 A.2d 213 (1983):

Unexplained possession of recently stolen goods gives rise to an inference that the possessor is the thief; *if the theft occurred as part of a burglary or robbery, the inference is that the possessor is the burglar or robber. The circumstantial evidence was sufficient to sustain the convictions for housebreaking and theft.*

(Emphasis supplied). *See also* Moylan, *Maryland's Consolidated Theft Law and Unauthorized Use* (MICPEL 2001), § 12.6, "Common Law Presumptions Still Operational," pp. 88–89 n. 31.

As a logically indistinguishable variation on the familiar theme, *Booker v. State*, 225 Md. 183, 186, 170 A.2d 203 (1961), was a decision approving the sufficiency of the inference to prove that the possessor of the recently stolen goods was not only the thief but an armed robber as well. The evidence in this case that, without challenge, proved that the appellant was guilty of theft was also legally sufficient to prove that he was guilty of the concomitant burglary.

Benjamin Nathan Cardozo was still sitting on the Court of Appeals for New York when he wrote for that Court in *People v. Galbo*, 218 N.Y. 283, 290, 112 N.E. 1041, 1044 (1916):

It is the law that recent and exclusive possession of the fruits of crime, if unexplained or falsely explained, will justify the inference that the possessor is the criminal. That rule has most frequently been applied in cases of burglary and larceny and receiving stolen goods; but it is not unknown in cases of murder. The highwayman kills his victim; the purpose of the murder is robbery; the same inference that identifies the robber identifies the murderer.

## PBJ and Impeachment of Credibility

■ The State's first witness was Eric Eisenrauch, the victim of the burglary. The appellant sought to impeach the testimonial credibility of Eisenrauch by showing that Eisenrauch had ostensibly been convicted of the possession of a

controlled dangerous substance. Judge Plitt ultimately did not allow the impeachment. The appellant's primary argument relies on Maryland Rule of Procedure 5–609(a), which provides in pertinent part:

> (a) Generally. For the purpose of attacking the credibility of a witness, evidence that *the witness has been convicted of a crime* shall be admitted if elicited from the witness or established by public record during examination of the witness[.]

(Emphasis supplied).

Although, to be sure, Eisenrauch had originally been convicted on April 22, 2009, his subsequent motion for a reconsideration of the sentence was granted and, on October 14, 2009, the trial judge struck out the original conviction and substituted a finding of probation before judgment. Accordingly, there was at trial time no "conviction" to trigger any reliance on Rule 5–609(a). As this Court observed in *Schmitt v. State,* 140 Md.App. 1, 41, 779 A.2d 1004 (2001):

> Churma actually did not have a prior conviction for theft. The record reveals that on July 7, 1993, *she received probation before judgment (PBJ)* after being charged with theft under $300. *Therefore, impeachment based on Maryland Rule 5–609 did not apply.*

(Emphasis supplied). *See also Myers v. State,* 303 Md. 639, 647–48, 496 A.2d 312 (1985) ("Probation before judgment . . . is not a conviction."); *Ogburn v. State,* 71 Md.App. 496, 501, 526 A.2d 614 (1987).

Maryland Code, *Criminal Procedure Article,* § 6–220 deals with probation before judgment. Subsection 6–220(g)(3) expressly provides: "Discharge of a defendant under this section shall be without judgment of conviction and is not a conviction for purposes of any disqualification or disability imposed by law because of conviction of a crime." In Joseph F. Murphy, Jr., *Maryland Evidence Handbook* (3d ed.1999), § 1302B, pp. 499–500, Judge Murphy admonishes:

> Please remember that impeachment by "conviction" requires a final judgment of conviction. *The witness who has*

*been found guilty but who has received "probation before judgment" ... has not been "convicted" for purposes of impeachment by conviction.*

(Emphasis supplied).

Judge Plitt properly ruled that a PBJ was not a conviction within the contemplation of Rule 5–609.

*609 of course deals only with impeachment by virtue of a prior conviction.* So when we are trying the case today, what would be relevant today in terms of impeachment would be what the status of that case is today. So under Maryland law, unless something has changed that I am not aware of, *probation before judgment is not considered a conviction* for any purpose under Maryland law. So *609* it seems to me *doesn't apply because he stands today not convicted.* If he had a conviction, of course under Judge Wilner's other Opinion which resolved the issue of whether a possession with intent conviction can be used to impeach credibility, that's clearly the case, but it's not a conviction.

(Emphasis supplied).

As a back-up sub-contention, the appellant turns to Rule 5–608(b), which provides in pertinent part:

(b) Impeachment by examination regarding witness's own prior conduct not resulting in convictions. The court may permit any witness to be examined regarding the witness's own prior conduct that did not result in a conviction but that the court finds probative of a character trait of untruthfulness.

▮▮▮ The most salient legal characteristic of Rule 5–608(b) is that the permissibility of the use of prior bad conduct is a decision entrusted to the wide discretion of the trial judge. The use of this impeachment device is by no means automatic. The judge is called upon to balance the actual probative value of the inquiry in the case at hand against the prejudice impacting on the character of the witness being impeached. In *Schmitt v. State,* 140 Md.App. at 42, 779 A.2d 1004, this Court pointed out that the use of such an inquiry is not automatic.

Any possible impeachment value of Ms. Churma's PBJ for theft under Rule 5–608(b) ("Impeachment by examination regarding the witness's own prior conduct not resulting in conviction") must satisfy *the requirement that the conduct is probative of a character trait of untruthfulness.* At the post-conviction hearing, the appellant offered no evidence regarding Ms. Churma's conduct that formed the basis of the theft charge or how that conduct potentially would have impacted on Ms. Churma's character for truthfulness.

(Emphasis supplied).

In *Ogburn v. State,* 71 Md.App. 496, 510, 526 A.2d 614 (1987), Judge Robert M. Bell (now Chief Judge of the Court of Appeals) wrote for this Court in emphasizing the wide range of discretion entrusted to the trial judge in applying a balancing test:

Where ... the inquiry has probative value and may tend to impeach the witness's credibility, but its relationship to the issue on trial is less direct and does not present so substantial a risk of a miscarriage of justice, *the trial judge may permit the inquiry; however, he does not abuse his discretion if he does not.* This latter situation is the situation *sub judice.* Accordingly we conclude that *the trial judge did not abuse his discretion when he refused to permit inquiry concerning the theft for which the witness received probation before judgment.*

(Emphasis supplied).

In this case, the appellant was not seriously contesting Eisenrauch's version of the factual events nor was he offering a counter version of his own. That diminishes the probative value of his ostensible effort to impeach Eisenrauch's testimonial credibility. That diminution, in turn, thereby enhances the proportionate weight of the counterbalancing prejudice factor, the danger that the jurors might use Eisenrauch's earlier brush with the law to conclude that he was a "bad man" and an unsympathetic victim of the appellant's crime. Judge Plitt balanced the pro's and con's of the inquiry and resolved the issue against the appellant:

[L]et's look at the relationship between the [criminal act] and the fact that he is a witness, not a defendant, and the fact that whether or not, since *we can't have a mini-trial, whether or not the prejudicial effect of it is outweighed by its probative value.*

To suggest that the probative value of this is based on a general presumption, which may or may not be true, that drug dealers engage in secretive kinds of activities, the mere fact drug dealers might engage in secretive kinds of activities does not necessarily I don't think lead to the conclusion that they are untruthful. You can be sneaky and truthful. You can be sneaky and untruthful.

I understand your position, but *I think in this particular case the prejudicial effect of it far outweighs its probative value so I am not going to allow it.*

(Emphasis supplied).

We hold that Judge Plitt did not abuse his discretion. Were we to hold otherwise, we would, as Judge Bell pointed out in *Ogburn v. State,* 71 Md.App. at 510, 526 A.2d 614, effectively be eliminating the very phenomenon of judicial discretion.

*Were we to conclude otherwise*—that whenever probation before judgment has been imposed for an infamous crime, the fact of the witness's commission of that crime is always admissible as a prior bad act, the preclusion of which is an abuse of discretion—*we would be* expanding *Cox* and, in the process, *effectively eliminating judicial discretion in this area.*

(Emphasis supplied).

### A Mistrial Is A Harsh Sanction

When Eisenrauch called the police on April 20, 2009, they responded to his home. At a point between "half an hour to 45 minutes into the investigation" the phone rang. Caller ID revealed that the caller was the appellant and Eisenrauch answered the phone as the police stood by. The direct examination of Eisenrauch proceeded:

Q [PROSECUTOR] And did you recognize the voice of the person speaking on the phone?

A [EISENRAUCH] Sure, of course.

Q Whose voice was that?

A *At the time, my best friend Brett.*

Q And who spoke first?

A He did. Well—

Q What did he say?

A Well, first he started yelling about, I had a business of mine broken into and he said that he didn't do that and it wasn't him and I said well, we have a videotape of you—

[DEFENSE COUNSEL]: Objection.

THE COURT: Sustained. Let me see counsel at the bench.

(Emphasis supplied).

Eisenrauch never completed the allegedly offending sentence and it is by no means clear what the videotape would have showed the appellant to have been doing. We will not blithely assume, as the appellant does, that the sentence, if completed, would have accused the appellant of having broken into and burglarized Eisenrauch's place of business. The very telephone conversation in question, moreover, has Eisenrauch referring to the appellant as "my best friend," an incomprehensible reference to one who has been observed burglarizing his business. The broken sentence was, at worst, ambiguous. In any event, a bench conference ensued that apparently resolved the contretemps:

THE COURT: Now, folks, I realize it's awful difficult to control a witness, but if this goes much further and you can't control him, you're flirting with a mistrial.

[DEFENSE COUNSEL]: I would ask for one at this point. We are talking about other crimes evidence.

[PROSECUTOR]: We are not talking about other crimes.

THE COURT: He just said, what he just said brought in some other crimes evidence.

[PROSECUTOR]: This is the defendant making the statement.

THE COURT: I know that but it's about something totally unrelated to this.

[PROSECUTOR]: Okay. All right. I will have to lead him a little bit.

THE COURT: I will have to tell the jury they are to ignore that. Let's be careful. You're skating on thin ice.

Counsel and the appellant returned to the trial table without further objection, and Judge Plitt gave a curative instruction to the jury:

The jury is to ignore the witness's last comment.

In *Drake and Charles v. State,* 186 Md.App. 570, 975 A.2d 204 (2009), *rev'd on other grounds,* 414 Md. 726, 997 A.2d 154 (2010), the trial judge had, in front of the jury, improperly criticized defense counsel for making objections merely for the purpose of being obstructive. Recognizing his error, the trial judge gave a corrective instruction. With respect to the presumptive adequacy of a curative instruction, Judge Deborah Eyler observed for this Court, 186 Md.App. at 589–90, 975 A.2d 204:

In the present case, the trial judge gave a forceful curative instruction at the outset of the next morning's proceedings, when jurors were most likely to be alert and understand it, and, furthermore, at the earliest feasible time after the error had occurred. The appellants have not rebutted the presumption that jurors ordinarily follow the court's instructions. *See, e.g., Greer v. Miller,* 483 U.S. 756, 766 n. 8, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987); *Dorsey v. State,* 185 Md.App. 82, 110 n. 8, 968 A.2d 654 (2009). In our view, *any possible prejudice to the appellant from the trial court's improvident remarks late on the day before was removed by the curative instruction.*

(Emphasis supplied).

In this case, moreover, no objection was made when Judge Plitt indicated that he would resolve the matter by giving the

curative instruction. In this regard, we also noted in *Drake and Charles v. State*, 186 Md.App. at 588–89, 975 A.2d 204:

As to the second, respecting the contents of the curative instruction, this issue was waived pursuant to Rule 4–325(e), which provides that a party may not assign error in the giving or failure to give an instruction "unless the party objects on the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection." *Here, no party objected to the curative instruction after it was given to the jury* (or, for that matter, at any time).

(Emphasis supplied). *See also Dennison v. State*, 87 Md.App. 749, 759, 591 A.2d 568 (1991).

 Quite aside from the lack of preservation, the granting of a mistrial is an extraordinary remedy that should only be resorted to under the most compelling of circumstances. In *Drake and Charles v. State*, 186 Md.App. at 587–88, 975 A.2d 204, Judge Eyler brought together the massive caselaw to this effect:

We review a trial court's denial of a motion for mistrial for abuse of discretion. *Cooley v. State*, 385 Md. 165, 173, 867 A.2d 1065 (2005); *Wilhelm v. State*, 272 Md. 404, 429, 326 A.2d 707 (1974); *Alston v. State*, 177 Md.App. 1, 6, 934 A.2d 949 (2007). *A mistrial is "an extraordinary remedy and should be granted only 'if necessary to serve the ends of justice.'" Klauenberg v. State*, 355 Md. 528, 555, 735 A.2d 1061 (1999) (quoting *Hunt v. State*, 321 Md. 387, 422, 583 A.2d 218 (1990)). *See also Garner v. State*, 142 Md.App. 94, 102 n. 4, 788 A.2d 219 (2002). *We will not reverse a trial court's denial of a motion for mistrial "unless it is clear that there has been prejudice to the defendant." Wilhelm*, 272 Md. at 429, 326 A.2d 707. *Accord Cooley*, 385 Md. at 173, 867 A.2d 1065; *Kosh v. State*, 382 Md. 218, 226, 854 A.2d 1259 (2004) ("The determining factor as to whether a mistrial is necessary is whether 'the prejudice to the defendant was so substantial that he was deprived of a fair trial.'") (quoting *Kosmas v. State*, 316 Md. 587, 595, 560

A.2d 1137 (1989)); *Wilson, supra,* 148 Md.App. at 666, 814 A.2d 1 ("The trial judge is in the best position to decide whether the motion for a mistrial should be granted. Accordingly, *we will not interfere with the trial judge's decision unless appellant can show that there has been real and substantial prejudice to his case.*").

(Emphasis supplied) *See also Fleming v. State,* 194 Md.App. 76, 94, 1 A.3d 572 (2010); *Washington v. State,* 191 Md.App. 48, 99, 990 A.2d 549, *cert. denied,* 415 Md. 43, 997 A.2d 792 (2010); *Wilson v. State,* 148 Md.App. 601, 666, 814 A.2d 1 (2002), *cert. denied,* 374 Md. 84, 821 A.2d 371 (2003); *Braxton v. State,* 123 Md.App. 599, 666–67, 720 A.2d 27 (1998).

Judge Plitt did not abuse his discretion in refraining from granting, *sua sponte,* a mistrial.

## The Plaintive Cry of Plain Error

The appellant contends that the prosecutor twice made an improper and prejudicial comment: once in opening statement and again in closing argument. On neither occasion was an objection made and the contention is not preserved for appellate review. The appellant, indeed, acknowledges what is in the normal course of events a fatal flaw:

> Admittedly, these comments were not objected to; accordingly, appellant requests this Court to exercise its discretion to recognize plain error.

As a practice that is unfortunately becoming epidemic, the appellant then proceeds to argue the merits of the unpreserved contention precisely as he would argue the contention if it had been preserved. He seems to be operating on the naive assumption that if his contention would be good enough to prevail on the merits if it had been preserved, that becomes *ipso facto* good reason why he should be entitled to the extraordinary plain error exemption from the preservation requirement. If on the merits he could prove less than that, of course, he would not be entitled to relief in any event and the preservation requirement would be meaningless. He is, in effect, claiming that an argument good enough to prevail

**180**

should prevail whether preserved or not. Nothing could be further from the truth.

In *Austin v. State*, 90 Md.App. 254, 261, 600 A.2d 1142 (1992), we said this as clearly as was possible:

> *The preservation rule contemplates error. It assumes that an error has probably occurred.* Its concern is that the error was not brought to the trial judge's attention so that he could have had the opportunity to correct it.

(Emphasis supplied).

We made precisely the same point again in *Stockton v. State*, 107 Md.App. 395, 398, 668 A.2d 936 (1995):

> [I]t is only after we have plain error as an established factor in the equation that our discretionary option to notice it or to ignore it even comes into play. *Our belief that an error actually occurred is not the end of our discretionary process, but only its beginning.*

(Emphasis supplied).

In *Morris v. State*, 153 Md.App. 480, 512, 837 A.2d 248 (2003), we catalogued the numerous factors that an appellate court may consider in the exercise of its discretion as we further pointed out that the possible success of the contention on the merits, if considered, is by no means dispositive:

> *Many trial advocates seem to suffer the misapprehension that if the instructional error, even in the absence of an objection, is plain and is material to the rights of the accused, the appellate court is thereby divested of its discretion and is required to consider the contention on its merits.* The appellate discretion is not so cabined. On the question of overlooking non-preservation, the appellate discretion is plenary.
>
> *The fact that an error may have been prejudicial to the accused does not, of course, ipso facto guarantee that it will be noticed.* As Judge Thompson pointed out in *Sine v. State*, 40 Md.App. 628, 632, 394 A.2d 1206 (1978):
>
> > *The mere fact that the alleged error may have resulted in some prejudice to the appellant does not, in itself, justify*

*the invocation of the plain error rule.* Otherwise, any error that could not be considered harmless would be reviewable and Rule [4–325(a) ] would be meaningless. (Emphasis supplied).

Nor does the fact that an error may have been *plain ipso facto* guarantee that it will be noticed. As Chief Judge Robert C. Murphy, on assignment to this Court in *Squire v. State,* 32 Md.App. 307, 309, 360 A.2d 443 (1976), *rev'd on other grounds,* 280 Md. 132, 368 A.2d 1019 (1977), explained:

> *[E]ven if an error in jury instructions is plain, its consideration on appeal is not a matter of right; the rule* is couched in permissive terms and necessarily *leaves its exercise to the discretion of the appellate court.* (citation omitted).

(Emphasis supplied).

Again in *Perry v. State,* 150 Md.App. 403, 436, 822 A.2d 434 (2002), we strove to drive home the point that even the likelihood of reversible error is no more than a trigger for the existence of discretion and not a necessarily dispositive factor in the ultimate exercise of that discretion:

> *There is a naive assumption that if a contention would prevail on its merits that it should be noticed under the "plain error" exemption, even if not preserved. Reversible error, however, is assumed,* as a given, before the purely discretionary decision of whether to notice it even comes into play.

(Emphasis supplied).

The reasons for exercising discretion in this extraordinary fashion are idiosyncratic, and a reason that might appeal to one appellate judge might have no interest for another. The only hard and fast rule with respect to this phenomenon is that there are no hard and fast rules.

Other than arguing the contention as if it had been preserved, all the appellant does is cite two cases for the unremarkable proposition that we enjoy the discretion to overlook non-preservation if we should wish to. Of course, we do. The

appellant, however, gives us no reason why we should wish to, although we have catalogued at length, not only in *Morris v. State, supra,* but also in *Austin v. State, supra,* what those possible reasons might be. The appellant ignores the advice we offered in *Perry v. State,* 150 Md.App. at 438, 822 A.2d 434.

All of this brings us down to a truism about appellate psychology that most appellants seem stubbornly unwilling to comprehend. When invoking unreviewable discretion, the arguments must appeal as much, if not more, to what the judge feels as to what the judge thinks. *Appellants, however, treat the legal argument in a "plain error" case just as if it had been preserved for review and just as if a reviewing panel were champing at the bit for a chance to address it. They blithely ignore the very real question of why the reviewing panel, if not required to address an issue, would wish to do so.*

(Emphasis supplied).

The appellant has not persuaded us of any reason why we should wish in this case to overlook the preservation requirement, and we shall not do so.

## A Descent Into Triviality

When Shakespeare wrote "Much Ado About Nothing" and English Parliamentarians disparaged "a tempest in a teapot," they may simply have been using laymen's language to anticipate the arrival of the Harmless Error Doctrine.[1] With this final contention, that anticipated convergence is upon us.

The appellant contends that he was erroneously denied the opportunity to have his counsel stage a demonstration in closing argument that arguably might have diminished the significance of something testified to by the burglary victim, Eric Eisenrauch. When Eisenrauch and Amy Batchellor were called upon to examine the treasure trove of property recov-

---

1. See Roger J. Traynor, *The Riddle of Harmless Error* (Ohio State University Press, 1970).

ered from the trunk of the appellant's automobile, they identified eight articles as belonging to them, which they had earlier described to the police in meticulous detail. One of them was a Sharp video camera belonging to Eisenrauch. As Eisenrauch's direct examination needlessly rambled on past the point of diminishing returns, however, Eisenrauch tossed in a gratuitous embellishment, unobjected to at the time, that ultimately touched a raw nerve in the defense psyche. Eisenrauch recounted that when he got his camera home, he screwed it onto its waiting tripod and then proudly showed the police how the two fit together. "Voila!"

It was, however, a meaningless "Voila!" It was a needless superfluity, except that it somehow stuck in the craw of the defense. The rightful ownership of the stolen goods generally, including the Sharp video camera, was never in issue. Quite aside from the camera, the purses and the necklace and the watch box and the tool bag clinched the case that the goods in the appellant's trunk had been stolen from Eisenrauch and Ms. Batchellor. The conjugal compatibility of camera and tripod was as meaningless a fillip as would have been Eisenrauch's triumphal announcement that the camera fit perfectly into its accustomed niche on the bookshelf or that its color matched that of the upholstery in the den or that Lassie wagged her tail when the faithful camera came home. What the appellant is now fighting about was, at most, a minuscule or Lilliputian corroboration of something that needed no corroboration.

The appellant has, indeed, conceded the only thing that the tripod match could conceivably have been used to show. The appellant concedes that his unexplained possession of goods recently stolen from Eisenrauch and Ms. Batchellor was legally sufficient to give rise to the inference that he was the thief. He does not challenge his conviction for theft based on that uncontroverted evidence. His only challenge, with respect to the burglary conviction alone, is with how far the permitted inculpatory inference may reach. The appellant's line in the sand is that the inference that he was the thief may not do double duty as an inference that he was also the burglar, even

where other evidence is enough to support the conclusion that the thief and the burglar were one and the same. The appellant does not challenge the only thing that the tripod fit might arguably have helped to show, to wit, that Eisenrauch was the rightful owner of the stolen camera. The appellant, in effect, concedes having lost the war but protests against the chutzpah of the victor in shouting the last hurrah. The witness's possibly excessive hubris, however, added nothing to the State's case.

To counter the last hurrah, defense counsel, the morning after this soupcon of testimony about the tripod fit was introduced, proffered to the court, "So I went home and grabbed my tripod and tried every camera I had and realized that, for the most part, tripods are universal and every camera has a hole in the bottom of it that it clicks into." Defense counsel then proposed doing a demonstration during closing argument of what she had done at home. Ultimately, over State objection, Judge Plitt did not allow it. The appellant contends that he was thereby denied a fair trial.

Due process, however, does not confer a right to respond to an inconsequentiality with a counter-inconsequentiality. Completely without regard to whether camera-tripod compatibility was shown to be unique or universal or something in between, the appellant's fate was sealed, and that is the quintessence of harmless error.

Although we would be loath to suggest that any error, even harmless error, occurred, a resort to hypothetical harmless error is the quickest and least ponderous route to disposing of this insubstantial contention. Even assuming, purely *arguendo*, that the denial of the demonstration was error, we are persuaded beyond all reasonable doubt that such assumed error made no difference whatsoever to the outcome of the case.

### Q.E.D.

The appellant was indisputably in possession of stolen goods. The defense offered no explanation so the possession

was, by definition, unexplained possession. Having been taken between seven and nine days earlier, the goods clearly qualified as having been recently stolen. From all of this, the permitted inference arose that the appellant was the thief. Other evidence established that the theft had occurred in the course of a burglary. Under the circumstance, the permitted inference that the appellant was the thief was, *ipso facto,* also a permitted inference that the appellant was the burglar.

Had Scotland Yard had the benefit of such evidence in 1888, the enigma of Jack the Ripper might well be something other than a still unresolved cold case.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**